# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40296 (f rev)**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Douglas C. BOREN**
First Lieutenant (O-2), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary[1]

*Upon Further Review*

Decided 19 March 2025

————————————

*Military Judge*: Sterling C. Pendleton (Trial); Jeremy L. Mooney (Remand).

*Sentence*: Sentence adjudged on 8 August 2021 by GCM convened at Ramstein Air Base, Germany. Sentence entered by military judge on 12 May 2022: Confinement for 30 days, forfeiture of $2,645.00 pay per month for 6 months, and a reprimand.

*For Appellant*: Major David L. Bosner, USAF; Catherine M. Cherkasky, Esquire.

*For Appellee*: Colonel Matthew D. Talcott, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Major Vanessa Bairos, USAF; Major Olivia B. Hoff, USAF; Major Brittany M. Speirs, USAF; Major Jocelyn Q. Wright, USAF; Captain Tyler L. Washburn, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, RICHARDSON, and ANNEXSTAD, *Appellate Military Judges*.

————————————

[1] Appellant appeals his conviction under Article 66(b)(1)(A), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 866(b)(1)(A), *Manual for Courts-Martial, United States* (2024 ed.).

Senior Judge ANNEXSTAD delivered the opinion of the court, in which Chief Judge JOHNSON and Senior Judge RICHARDSON joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

ANNEXSTAD, Senior Judge:

A general court-martial consisting of officer members convicted Appellant, contrary to his pleas, of one specification of abusive sexual contact in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[2,3] The members sentenced Appellant to confinement for 30 days, forfeiture of $2,645.00 pay per month for six months, and a reprimand. The convening authority took no action on the findings and approved the sentence in its entirety.

On 24 June 2024, we remanded Appellant's record of trial to the Chief Trial Judge, Air Force Trial Judiciary, for correction of the record, specifically to account for missing exhibits and documents. On 12 July 2024, Appellant's case was re-docketed with this court. Issues concerning completeness of the record of trial have been resolved.

On 29 July 2024, Appellant raised five issues on appeal which we have rephrased and reordered: (1) whether Appellant's conviction is legally and factually sufficient;[4] (2) whether trial counsel engaged in prosecutorial misconduct during findings argument; (3) whether the military judge erred in failing to suppress Appellant's statements to investigators; (4) whether the post-trial processing of Appellant's case was improperly completed when the staff judge advocate found 18 U.S.C. § 922 applied to Appellant's conviction of a non-violent offense; and (5) whether Appellant is entitled to relief for numerous post-

_____

[2] Unless otherwise noted, all references to the UCMJ are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] Appellant was acquitted of one specification of sexual assault in violation of Article 120, UCMJ, involving a different alleged victim.

[4] On 31 October 2024, we specified a related issue for supplemental briefing: whether Appellant's conviction for abusive sexual contact in violation of Article 120, UCMJ, is legally and factually sufficient in light of our superior court's recent decision in *United States v. Mendoza*, ___ M.J.___, No. 23-0210, 2024 CAAF LEXIS 590 (C.A.A.F. 7 Oct. 2024).

trial processing delays. We also consider one additional issue not raised by Appellant: (6) whether the wording of the reprimand rendered Appellant's sentence inappropriately severe.

We have carefully considered issue (4) and find it does not warrant discussion or relief. *See United States v. Vanzant*, 84 M.J. 671, 681 (A.F. Ct. Crim. App. 2024) (holding the 18 U.S.C. § 922 firearm prohibition notation included in the staff judge advocate's indorsement to the entry of judgment is beyond a Court of Criminal Appeals' statutory authority to review), *rev. granted*, __ M.J. __, No. 24-0182/AF, 2024 CAAF LEXIS 640 (C.A.A.F. 17 Oct. 2024).

As to issue (6), we find Appellant's sentence is inappropriately severe and provide relief by modifying the sentence in our decretal paragraph.

Finding no other error that materially prejudiced Appellant's substantial rights, we affirm the findings and sentence, as modified.

## I. BACKGROUND

Appellant met KK in 2019 while they were on a group trip with mutual friends. At the time, both were active duty servicemembers assigned in Germany. Following the trip, Appellant and KK became friends and socialized at Appellant's home on a few occasions, usually for dinner and a movie. While Appellant had previously hosted larger group dinners at his home for their friend group, due to COVID-19 protocols, all interactions during the spring of 2020 were limited to one-on-one get-togethers. KK viewed their relationship as friends and did not have any romantic feelings towards Appellant.

Appellant's romantic feelings towards KK did not become clear until Appellant invited her on a picnic. During the picnic Appellant placed his hand on top of KK's hand, causing her to immediately pull it away. Later that night, while Appellant and KK were at Appellant's house, Appellant communicated his romantic feelings towards KK and told her that he would like to go on a date with her. KK testified that this caught her off guard and she did not immediately respond to his offer. Later that evening, after KK returned to her residence, she sent Appellant a text message informing him that she was not "emotionally available" to date anyone due to a recent, difficult break up. Additionally, KK attempted to establish boundaries for their friendship going forward, communicating she was only available as a friend and that if Appellant was not accepting of her wishes, that they should not spend any more time together. Appellant acknowledged KK's feelings and perspective, and indicated that he was happy to continue just being friends. Subsequently, they made plans to get together for another dinner and a movie night.

On 11 May 2020, KK arrived at Appellant's house around 1830 hours. They prepared and ate dinner together. During dinner KK consumed an alcoholic

seltzer. After dinner they decided to do whiskey tasting, as Appellant collected whiskey from different countries and KK enjoyed whiskey. Together they selected five different whiskey brands to sample. They poured about a half ounce of whiskey in each glass for tasting. KK testified that they spent about ten minutes sampling each whiskey. After tasting the third whiskey, they decided to break and watch the movie. During the movie, they ate dessert and KK sampled a glass of soju, another alcoholic beverage, but did not finish the glass. While watching the movie KK also consumed another alcoholic seltzer and a whiskey shot. After consuming these drinks, KK started to feel "tipsy" and a "little buzzed," but testified that she was "alert and definitely aware of everything going on."

After watching some more of the movie, Appellant and KK decided to finish tasting the final two whiskeys they selected. KK testified that she did not finish the final sample of whiskey. At this point KK started to feel intoxicated and testified that the next thing she remembered was feeling sick, dizzy, and nauseous. She stated that she then went in the bathroom and began to vomit. While vomiting KK became emotional, "crying a lot" about her break-up with her ex-boyfriend. Appellant attempted to assist KK, holding her hair back and attempting to console her. He also brought her some Pedialyte (an electrolyte and sugar drink) and water. KK testified that she was in the bathroom for a couple of hours.

During trial, the Government presented the recording of Appellant's interview with the Air Force Office of Special Investigations (OSI). During the interview Appellant confirmed that KK was vomiting for approximately three hours. He described her demeanor while she was vomiting as emotional, shivering, and cold. He further informed OSI that KK spent some time lying on the bathroom floor and was falling asleep on the toilet. Eventually, Appellant suggested that she lie down in bed. KK testified that she thought Appellant was taking her to his guest bedroom, which they had discussed earlier that evening as an option if she had too much to drink. KK walked upstairs on her own, and went into a bedroom, immediately lying down on her side in a fetal position in Appellant's bed. She had the bed covers over her. KK testified that she thought she was in the guest bedroom, consistent with their discussion earlier that evening.

During her testimony KK explained what happened next:

> So I woke up and I was on the left side of my body, and I could feel – I could feel something touching my vagina. And I froze and I could hear [Appellant] like some sort of like mumbled, and it stopped. And then I waited and I just – I think I was in shock, like, Is this really what I'm feeling? Is this really happening? And then – and then he started stroking my vagina again.

4

KK stated that he was touching her vagina over her clothing. She also described he was touching her in a "stroking motion" going back and forth on her vagina with his fingers. KK continued to explain,

> So the second time I – it was very clear. There was no doubt in my mind what was happening. And I immediately shot up. I got on my knees and I – I felt like I was going to throw up again – and so I told him that and he handed me a bucket. And I didn't throw up, but I like dry heaved and spit up a little bit. And then I started calling him on what he did to me. I told him that it wasn't okay. I looked at him once and he cowered. He immediately cowered. He put his head down and his hands up and just, you know, "I'm sorry, this isn't me." And I immediately counteracted, "Well, this is you, this is what you're doing to me. . . ."

During her testimony, KK specifically stated that she did not consent to Appellant touching her vagina. She also stated that she did not want him to touch her vagina.

Upset at this point, KK told Appellant she was going to leave. She walked downstairs without any assistance and called a friend for a ride home. While downstairs KK stated that Appellant attempted to have a conversation with her, and that she ignored him until he went back upstairs. KK described that she was still in "shock" and "disbelief" when she called her friend. She also described being upset and crying when her friend finally picked her up.

The following day, after some consideration, KK filed an unrestricted sexual assault report. Following her interview with OSI, KK confronted Appellant via a social media messaging application. The following conversation was admitted as a prosecution exhibit during Appellant's court-martial.[5]

> [KK:] Hi [Appellant]. I want to address what happened last week when I woke up. I'm really concerned about how we left things. We are friends and I want to clear the air. I woke up to you touching my vagina. I know you did it multiple times because I laid there at first not believing what I was feeling and wanted to make sure that it was actually happening. You know that wasn't okay to touch me like that, especially while you knew I was sleeping?

---

[5] The text messages are in their original form with no edits.

[Appellant:] What i did was definitely not okay, and I really am sorry. It wasnt okay for a multitude of reasons, and I've felt disgusted with myself for it. I betrayed your trust, and i shouldn't have put us in that situation.

[KK:] How long were you touching my vagina?

[Appellant:] I dont know exactly, but i dont think it was long before you woke up and started vomiting. Less than a few minutes.

[KK:] [Appellant], I know I'm coming on strong. I'm struggling and trying to understand. Did you touch me anywhere else?

[Appellant:] No, it's fine. And i honestly didn't

[KK:] I really appreciate you being willing to talk to me about this. I dont remember everything. I'd like to know more about the night . . . did we even finish the movie?? Haha

[Appellant:] It's understandable, and really, I can't apologize enough. We shoulda slowed down after you told me you had your friends promotion. We definitely did not finish the movie, we had half time to finish the whiskey tasting, tried to restart then you ran to the bathroom to puke, and that was the rest of the night

[KK:] What happened after I puked?

[Appellant:] You were puking for a solid 2 hours, tried to give you some Pedialyte but you weren't able to keep anything down. You started to fall asleep on the toilet, and you said you were freezing, so then i got you upstairs with a bucket to sleep.

[KK:] Thanks for taking care of me. I can't believe I got so sick. The bed I slept in was super comfy. What room did you help me into?

[Appellant:] It's not a problem, we definitely had way too much haha. And that was my bed.

[KK:] [Appellant], Why did you touch me like that?

[Appellant:] I don't know, i have no clue what came over me. I really dont have a clue why I thought it was something that was okay

[KK:] I appreciate you being honest with me.

[Appellant:] Yeah, it's the least I can do.

. . .

6

[KK:] Hmm ok. How long was I asleep for?

[Appellant:] I don't think we were upstairs for more than 30 minutes, if that.

[KK:] Thanks again for answering my questions.

[KK:] [Appellant], touching someone like that is not normal without consent and it's most definitely not okay. You really need to seek help from a counselor to figure out why you would touch someone like that or you are never going to have a healthy relationship with someone. Touching someone or doing anything to someone without their consent is so violating and detrimental. I recommend asking for help.

[Appellant:] I've already called my [counselor] to meet with me. i don't think I'll ever be able to apologize enough, and I dont expect you to forgive me. I honestly don't know why i did it, and I know it's not normal or right. I seriously betrayed your trust and you're right.

A panel of officer members convicted Appellant of the one specification of abusive sexual contact upon KK and found Appellant not guilty of the other specification of sexual assault upon another individual.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

In his appeal, Appellant challenges the legal and factual sufficiency of his conviction. Specifically, Appellant argues that his conviction is legally insufficient because the Government violated his due process rights by conflating two different theories of criminal liability under Article 120, UCMJ, during his court-martial. Appellant argues that the evidence is also factually insufficient to sustain a conviction because "there is a significant question as to the progression of events between [Appellant] and KK in the bed."

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n

resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). "This deferential standard impinges upon the factfinder's discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *United States v. Mendoza*, ___ M.J.___, No. 23-0210, 2024 CAAF LEXIS 590, at *9 (C.A.A.F. 7 Oct. 2024) (internal quotation marks and citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

Article 120(d), UCMJ, criminalizes abusive sexual contact in the military and the UCMJ defines multiple ways in which the Government may prove the offense. *MCM*, pt. IV, ¶ 60.b.(4)(d). Relevant to this case, the UCMJ provides that the offense of abusive sexual contact can be committed *inter alia* "without consent," upon "a person who is asleep, unconscious, or otherwise unaware the contact is occurring," or "[w]hen the other person is incapable of consenting." *MCM*, pt. IV, ¶ 60.b.(4)(d)–(f).

To convict Appellant of abusive sexual contact without consent against KK as charged, the Government was required to prove the following elements beyond a reasonable doubt: (1) that Appellant committed sexual contact upon KK; and (2) that Appellant did so without KK's consent. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(4)(d).

"'[S]exual contact' means touching or causing another person to touch, either directly or through the clothing, the vulva, . . . of any person, with the intent to . . . gratify the sexual desire of any person." *MCM*, pt. IV, ¶ 60.a.(g)(2).

"'[C]onsent' means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "A sleeping . . . per-

son cannot consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(B). "All the surrounding circumstances are to be considered in determining whether a person gave consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(C). "The burden is on the actor to obtain consent rather than the victim to manifest a lack of consent." *United States v. McDonald*, 78 M.J. 376, 381 (C.A.A.F. 2019); *cf. United States v. Rodela*, 82 M.J. 521, 529 (A.F. Ct. Crim. App. 2021) (finding evidence did not support "a reasonable belief that consent has been obtained (or given)").

Our superior court's recent decision in *Mendoza* held that the Government cannot "charge one offense under one factual theory and then argue a different offense and a different factual theory at trial" without violating Appellant's constitutional rights, as "[d]oing so robs the defendant of his constitutional 'right to know what offense and under what legal theory he will be tried and convicted.'" 2024 CAAF LEXIS 590, at *18 (citation omitted) (quoting *United States v. Riggins*, 75 M.J. 78, 83 (C.A.A.F. 2016)). Accordingly, to convict under a lack of consent theory without violating an accused's constitutional rights, the Government is required to prove that victim is capable of consenting but does not consent and cannot rely on showing that the victim was too intoxicated to consent, *id.* at *22, or that the victim was asleep.

### 2. Analysis

Appellant contends that his conviction is both legally and factually insufficient. Appellant argues that the Government prosecuted this case under a different theory—while asleep, rather than the charged theory of without consent. In doing so, Appellant argues that the Government failed to present sufficient evidence that KK was capable of consenting and did not consent to the sexual contact. We disagree. While the contact may have started while KK was asleep, Appellant's conduct continued after she was awake and able to consent.

Here, the Government presented convincing evidence of Appellant's guilt under a lack of consent theory. The testimony from KK was clear and corroborated by Appellant's own admissions. During Appellant's court-martial, KK testified that she awoke to the feeling of Appellant touching her vagina with his fingers through her clothing. She also testified that after she was awakened due to Appellant's actions that the touching stopped. Next, she described for the members how she laid there awake attempting to process what had just happened and that Appellant touched her vagina again in the same manner. KK then described how Appellant's actions caused her to quickly get out of the bed and shortly thereafter confront Appellant about his conduct before leaving his residence. She also described being upset with Appellant regarding what had occurred and that the following day, after some consideration, she filed an unrestricted sexual assault report.

Additionally, the evidence introduced at trial demonstrates that, towards the end of the encounter, KK was both capable of consenting and never consented to Appellant touching her vagina. First, the Government presented ample evidence to establish that KK was awake and capable of consenting when the *actus reus*—the touching her vulva with his hand, through the clothing with intent to gratify his sexual desire—was occurring. Here, the evidence established that she was capable of recognizing what was happening, who was doing it, and was able to take action to prevent Appellant from continuing to touch her vagina.

The evidence also established that at no point prior to, during, or after the touching did KK consent to Appellant touching her vagina. KK specifically testified that she did not want Appellant to touch her vagina and that she did not, at any point, consent to him touching her vagina. Furthermore, the Government presented testimony and documentary evidence regarding KK's negative reaction to the unwanted touching and the text conversations KK had with Appellant that occurred a few days after the incident. During the latter communication between KK and Appellant, Appellant confirmed that he touched her vagina while he thought she was asleep. At no point in these communications did Appellant claim KK consented to sexual contact. To the contrary, in response to KK informing Appellant that "touching someone like that is not normal without consent and it's most definitely not okay," Appellant acknowledged that he did not have consent, responding, "I honestly don't know why i did it, and I know it's not normal or right. I seriously betrayed your trust and you're right."

Relying on *Mendoza*, Appellant argues that because the Government presented evidence and argument that the victim was asleep when the touching started, he was tried under a different theory of abusive sexual contact. We disagree. Here the Government presented the facts and circumstances surrounding the abusive sexual contact, which included the fact that KK was asleep when Appellant began to touch her vagina. The law permits the factfinder to consider all the surrounding circumstances when determining whether a person gave consent. *MCM*, pt. IV, ¶ 60.a.(g)(7)(C); *cf. Mendoza*, 2024 CAAF LEXIS 590, at *22 (the Government may offer "evidence of an alleged victim's intoxication to prove the absence of consent") (footnote omitted)). The fact that KK was asleep when the touching started supports a conclusion that at no point prior to the touching had she consented to Appellant touching her vagina when she was awake.

The Government needed to prove lack of consent, and they did. Viewing the evidence offered by the Government, we find the evidence established that prior to the events of 11 May 2020, KK and Appellant shared a friendship but were never intimate. When it became apparent to KK that Appellant might

have romantic feelings towards KK, she took immediate steps to inform Appellant that she was not romantically interested in him, and that she only wanted to be friends. The Government also established that Appellant understood the boundaries of their friendship and was content with continuing the friendship. Moreover, as mentioned, *supra*, the Government established that KK did not consent to being touched by Appellant at any point prior to falling asleep on the night of the incident.

Giving full consideration to Appellant's arguments and drawing every reasonable inference from the evidence in favor of the Government, we conclude that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, and therefore the evidence is legally sufficient to support Appellant's conviction. Additionally, "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. Therefore, we also conclude that Appellant's conviction is factually sufficient.

## B. Improper Findings Argument

Appellant contends that circuit trial counsel committed prosecutorial misconduct by arguing Appellant had the burden to obtain consent.[6] We also consider whether circuit trial counsel erred by arguing a different factual theory than the charged factual theory.

### 1. Additional Background

Circuit trial counsel began his findings argument by noting that Appellant violated KK's trust when he touched her "on her vagina and her vulva without her consent." He then argued that KK "[t]rusted him enough to fall asleep. And in that moment when she was asleep, unable to do or say anything, he violated that trust by touching her vulva without her consent." Circuit trial counsel continued:

> She was asleep. You have the military judge's instruction that a sleeping person cannot consent. And you know that she was asleep, not only because the accused himself admits to it, but she was able to take this stand and to explain to you the way that

---

[6] After careful consideration of Appellant's contention that circuit trial counsel erred when he argued that Appellant had the burden to obtain consent, we find the issue does not require discussion or relief. *See United States v. Guinn*, 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)); *see also McDonald*, 78 M.J. at 381 ("The burden is on the actor to obtain consent rather than the victim to manifest a lack of consent.").

experience is different. The way that she could recognize the sensation and the feeling of falling asleep. Of thinking this bed is comfortable and safe. And then the alertness of when she wakes up.

And, members, you're allowed to use your common sense and your knowledge of the ways of the world. That alertness she described, that's what happens when a person is asleep and something external shocks them. That's what happens when someone is asleep and there is a feeling of something on the vagina, on the vulva, on a part of the body where nothing should be. She wakes up. And because she's asleep in that moment before, she's never given the opportunity to consent.

Later in circuit trial counsel's argument he discussed the defense of mistake of fact as to consent, and stated:

Members, there is nothing reasonable about believing that there is consent to touch someone's vagina when they are asleep. Not under the facts of this case. Not when the two of them are only friends. Not when they had no preexisting relationship. Not when she is throwing up for two to three hours in a bathroom and then goes to sleep.

Circuit trial counsel then addressed trial defense counsel's cross examination of KK:

Now there was one point during defense counsel's cross-examination when he asked [KK], is it possible that you had consented, and she said it's possible. I want you to think about what that was, because she had already said, I did not consent. She said, I was asleep. She said, That woke me up. And when she's saying it's possible, she's just saying, You know what, it's possible I said something during that blackout state, but it is not possible that after she fell asleep that she consented in that moment. And that's what you're here to decide. It's in that moment, at that time when the accused touched her whether she had consented. That is not a fair possibility.

At the end of his closing argument circuit trial counsel stated, "What you have at the end of the day is that she trusted her friend, fell asleep at his house, and while asleep was touched without her consent."

Subsequently, during Defense's argument trial defense counsel argued:

[KK] says to you that she woke up when he's touching her vagina, and that she feels only that for a few seconds before it

stops, and then it starts again. And she's quizzed on it time and time again by the [G]overnment and by us, and she maintains it. And it's unfortunate for her because as we know when she actually gets into that car with a friend, there's a lot more to whatever was going on. He's touching her back, her thigh, her butt, and her vagina.

. . . .

She wakes up and she doesn't like it. You have to imagine what could be going on in that bed. The only thing that she gives you about the setting is that there's a hand. She doesn't even put [Appellant] in the bed.

Circuit trial counsel then began his rebuttal closing argument by stating:

As the military judge has instructed you, lack of physical or verbal resistance is not consent. There are two elements to decide for you to resolve in the question of the abusive sexual contact charge against [KK]. And that is whether the sexual contact happened and whether she consented. That is the burden that the [G]overnment bears. The [G]overnment needs to prove that she did not consent at that moment.

Now defense counsel talked for a while in his closing argument about feelings. Members, feelings can be evidence. For instance, that feeling [KK] had when she woke up and felt [Appellant]'s hands on her vagina. That is a feeling that is testimony, that is evidence for you to consider. The fact that she waited because she didn't want to believe what was happening. And then she felt it again. That is evidence.

. . . .

There could be a case where there's an actual progression. Defense counsel talked about how there could be a natural progression to sexual activity. And that's true. Consent can be manifested through different ways. But that's not the testimony that you heard in this case. That's not the evidence before you. Because you don't have evidence of escalating sexual activity between [KK] and [Appellant]. Even assuming that [Appellant] told the truth in that subject interview.[7] Even assuming that

---

[7] During Appellant's recorded interview with special agents from the Air Force Office of Special Investigations, Appellant told investigators that he and KK kissed on the night of the incident while they were watching the movie.

> kiss happened, there's no escalation from the kiss to touching her vagina while she's asleep. There's an interval of throwing up. There was a time of going to a bed, expecting to be alone in that bed, and then falling asleep.
>
> Is there a grace period in which someone can engage in sexual activity and then be told no and stop? Not when you begin that engagement when the other person is asleep. Because a sleeping or unconscious person cannot consent.

Circuit trial counsel then discussed Appellant's text messages to KK following the incident and stated to the members that Appellant "admits to [KK] that he touched her vagina while she was asleep because that's what happened."

Trial defense did not object to any of circuit trial counsel's argument that mentioned KK being asleep.

**2. Law**

"Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citations omitted).

We review prosecutorial misconduct and improper argument de novo. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted). When no objection is made at trial, we review for plain error. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018) (footnote and citation omitted). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Id.* at 401 (quoting *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005)).

"[A]rgument by a trial counsel must be viewed within the context of the entire court-martial. The focus of [the] inquiry should not be on words in isolation, but on the argument as 'viewed in context.'" *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (quoting *United States v. Young*, 470 U.S. 1, 16 (1985)) (additional citations omitted). In performing our review, "it is improper to 'surgically carve' out a portion of the argument with no regard to its context." *Id.*

> Appellate judges must exercise care in determining whether a trial counsel's statement is improper or has improper connotations. The [United States] Supreme Court has emphasized that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."

*United States v. Palacios Cueto*, 82 M.J. 323, 333 (C.A.A.F. 2022) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)). Thus, "[a] statement that might appear improper if viewed in isolation may not be improper when viewed in context." *Id.* (citing *Donnelly*, 416 U.S. at 645).

The due process principle of fair notice mandates that an accused has the right to know what offense and under what legal theory he will be convicted. U.S. CONST. amend. V; *United States v. Jones*, 68 M.J. 465, 468 (C.A.A.F. 2010).

"When a trial counsel makes an improper argument during findings, 'reversal is warranted only when the trial counsel's comments taken as a whole were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *United States v. Norwood*, 81 M.J. 12, 19 (C.A.A.F. 2021) (quoting *Andrews*, 77 M.J. at 401–02). In general, appellate courts "weigh three factors to determine whether trial counsel's improper arguments were prejudicial: '(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.'" *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184).

Where an error is of constitutional dimensions, an appellate court may not affirm the result unless the error was harmless beyond a reasonable doubt. *United States v. Mason*, 59 M.J. 416, 424 (C.A.A.F. 2004). This inquiry requires the Government to demonstrate that there was no reasonable probability that the error might have contributed to the conviction. *United States v. Tovarchavez*, 78 M.J. 458, 462 n.5 (C.A.A.F. 2019) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

### 3. Analysis

Because trial defense counsel did not object to the portions of circuit trial counsel's argument referenced *supra*, we review circuit trial counsel's argument for plain error. We assume without deciding that circuit trial counsel committed plain error in light of our superior court's decision in *Mendoza* by potentially suggesting during argument that Appellant be convicted of an offense under a factual theory that was different than the factual theory of the charged offense. Specifically, some of circuit trial counsel's comments could be understood to suggest Appellant was guilty of abusive sexual contact when he touched KK's vulva while she was asleep—contrary to *Mendoza*—as well as after she awoke. We further assume that the error was of constitutional dimensions and that we must determine if the error was harmless beyond a reasonable doubt.

We begin our inquiry by looking at circuit trial counsel's argument as a whole and the evidence presented by the Government during trial. We first

note that while circuit trial counsel did mention during his argument that a sleeping person cannot consent, he did not argue that the theory of their case was that KK was asleep and therefore could not consent to the sexual contact. In fact, circuit trial counsel mentioned multiple times that KK awoke to the feeling that she was being touched on her vagina over her clothes and that while awake was touched again on her vagina by Appellant. Consistent with our superior court's decision in *Mendoza*, this argument emphasized Appellant touched KK while she was capable of consenting and in fact did not consent to the contact. The fact that KK was asleep when the unlawful touching started was a fact and circumstance surrounding the charged sexual contact, *i.e.*, that it explained why KK was so startled to be awakened to being groped and why she did not consent to that continued groping after she awoke, and therefore it was an appropriate fact for circuit trial counsel to comment on during closing argument.

Additionally, the fact that KK was asleep was also relevant evidence for the Government to establish that at no point that night, prior to the unlawful contact, had KK consented to the sexual contact. To this end, the Government sufficiently established that KK informed Appellant that she had no romantic interest in Appellant, and did not consent at any point prior to the contact, to include the period of time while she was vomiting in the bathroom or while she was asleep in the bedroom. Her actions after Appellant touched her vulva while she was awake are consistent with someone who did not consent to being touched in a sexual manner by Appellant. Moreover, the fact that the evidence established Appellant first touched KK's vulva while she was asleep and incapable of consenting, and then touched her vulva while she was awake and capable of consenting but did not consent, does not detract from proof Appellant committed the charged offense of abusive sexual contact without consent—it simply contextualized why she did not consent to that touching that continued after she awoke.

We also find a discussion of all the evidence offered by the Government helpful. As we noted *supra*, the Government's case was strong, and included convincing testimony from KK, corroborating evidence from an outcry witness, and Appellant's own admissions to the charged conduct. The Government's case also included evidence of Appellant's interview with investigators where he attempted to walk back his earlier admission by raising a mistake of fact defense among a number of other explanations. Here, after a thorough review of the record, including the arguments by the parties, there is no reasonable doubt that the Government's case established that Appellant touched KK's vulva while she was capable of consenting to the contact and that she did not consent to the contact.

In contrast, the Defense's case was not strong and substantially weakened by Appellant's various post-offense statements and admissions. We do not find any evidence in the record to suggest that there was any confusion by Appellant as to what offense he was defending against. In fact, the Defense argued during their findings argument that KK may have consented to the contact, and that Appellant possessed a reasonable mistake as to consent. Additionally, the Defense argued that even if KK did not consent that the Government failed to establish that it was KK's vulva that he touched. Removing the presumptively improper portions of circuit trial counsel's argument would not have materially strengthened the Defense's arguments nor detracted from the evidence proving Appellant's guilt.

In conclusion, we find that the Government has met its burden to demonstrate that there was no reasonable probability the outcome of Appellant's court-martial would have been different had the assumed error not occurred. Therefore, we find the assumed error was harmless beyond a reasonable doubt and that Appellant is not entitled to any relief on this basis.

## C. Voluntariness of Appellant's Statement to OSI

Appellant contends that the military judge abused his discretion in finding that Appellant clearly and unequivocally waived his right to counsel. Specifically, Appellant argues that his statement to investigators should have been suppressed because the OSI investigator, Special Agent (SA) NC, reordered the questions on the standard rights advisement card, which Appellant argues amounted to trickery rendering his statements involuntary. Appellant further argues that he unequivocally asserted his right to counsel at the beginning of the interview and that all subsequent questioning should have stopped until counsel was made available.

### 1. Additional Background

On 26 May 2020, Appellant was interviewed by OSI concerning allegations of abusive sexual contact against KK. Because he was suspected of a crime, SA NC, the agent investigating the alleged offense, advised Appellant of his rights. The following exchange between SA NC and Appellant was recorded and admitted as Prosecution Exhibit 5:

> [SA NC:] I am [SA NC], a member of the Air Force Office of Special Investigations. I am investigating the alleged offense of UCMJ Article 120, Abusive Sexual Contact, of which you are suspected. I advise you that under the provisions of Article 31, UCMJ, you have the right to remain silent, that is, say nothing at all. Any statements you make, oral or written, may be used as evidence against you in a trial by courts-martial or in other ju-

dicial or administrative proceedings. You have the right to consult a lawyer and to have a lawyer present during this interview. You have the right to military legal counsel free of charge. In addition to military counsel, you are entitled to civilian counsel of your own choosing at your own expense. You may request a lawyer at any time during this interview. If you decide to answer questions, you may stop the questioning at any time. Do you understand your rights?

[Appellant:] Yes.

[SA NC:] Are you willing to answer questions?

[Appellant:] Yes.

[SA NC:] Do you want a lawyer?

[Appellant:] Yes?

[SA NC:] Okay, I just want to caveat that. If you request a lawyer, we're just gonna have to stop the interview.

[Appellant:] Okay.

[SA NC:] Um, and then we'll stop there. Because the I can't . . . I am not going to ask you any further questions.

[Appellant:] Okay.

[SA NC:] Pertaining to what I just read you to without your lawyer present.

[Appellant:] Okay.

[SA NC:] So, that was just to clear it up. I'm just going to ask you again now. Do you want a lawyer . . . ?

[Appellant:] [pauses for approximately nine seconds] Sorry, I'm just like . . .

[SA NC:] Take your time, man.

[Appellant:] Yeah, so, just so I understand. So if I request a lawyer now, we have to, we have to pull them and schedule to speak to a lawyer?

[SA NC:] Yeah, we can't ask you anything, like I said, I explained earlier. If you're worried, like you are curious, but, "I've got nothing to hide and I want to talk to you guys and keep on talking." But, if you are worried that there is a question you don't like, we'll say, "[H]ey, not that question, I don't want to answer that question," we can move on . . .

[Appellant:] No lawyer.

[SA NC:] Excuse me?

[Appellant:] No lawyer. I'm good.

[SA NC:] Let me read it again, so I can make it clear. All right, um, I'm just going to read you the questions.

. . . .

[SA NC:] Do you understand your rights?

[Appellant:] Yes.

[SA NC:] Are you willing to answer questions?

[Appellant:] Yes.

[SA NC:] Do you want a lawyer?

[Appellant:] No.

After his interview, Appellant provided a written statement on Air Force Form 1168, *Statement of Suspect/Witness/Complainant*. On that form, Appellant also acknowledged his rights under the Fifth Amendment of the Constitution[8] and Article 31, UCMJ, 10 U.S.C. § 831, by personally initialing each of those rights indicated on the form. Appellant once again indicated by his initials that he did "not want a lawyer" and that he was "willing to answer questions or make a statement or both, about the offense(s) under investigation."

During his court-martial, in an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing, Appellant moved to suppress his statements made to OSI. Appellant presented testimony from SA NC followed with argument by his trial defense counsel. The military judge initially denied Appellant's motion to suppress. Appellant's trial defense counsel then requested reconsideration of the military judge's ruling and was allowed to present additional evidence and argument. After further consideration of his ruling, the military judge again denied Appellant's motion to suppress.

SA NC testified during the Article 39(a), UCMJ, hearing that when he provided the rights advisement to Appellant, he deviated from the order of the questions on the rights advisement card by asking Appellant "are you willing to answer questions," before asking, "do you want a lawyer." SA NC stated that based on his experience, he believed asking the questions in that order created a better flow and created less confusion on the part of an accused. SA NC specifically stated that he did not reorder the questions in an attempt to confuse Appellant or to elicit an incriminating response. SA NC explained that when

---

[8] U.S. CONST. amend. V.

Appellant initially stated "yes" to wanting a lawyer, it seemed like he was not sure, so SA NC provided additional clarification on what effects invoking his rights would have on his ability to answer questions. Specifically, SA NC informed Appellant that if he elected to have a lawyer, they would have to terminate the interview. SA NC again explained that this clarification was not intended to coerce Appellant, but instead was meant to ensure Appellant understood the rights advisement and to clarify whether Appellant was indeed invoking his right to counsel.

Having had the chance to personally observe SA NC's testimony and demeanor, the military judge found as a matter of fact that SA NC testified credibly during the motions hearing. He further found that Appellant's initial "yes" to the question regarding legal representation was given in an "equivocating and uncertain manner, with an inflection and tone reflecting ambiguity."

In his conclusions of law, the military judge analyzed the test for waiver under the applicable law. He found that based on the totality of the circumstances, Appellant "was fully aware of his rights, understood the nature of his rights and generally how they would be applied," and that he "knowingly, intelligently, and voluntarily waived his rights." He further found that Appellant's initial "yes" regarding right to counsel was not "sufficiently clear" and "a reasonable police officer under the circumstances would NOT have understood the [Appellant's] response to have been articulated 'sufficiently clearly' enough to be a request for an attorney."

**2. Law**

We review a military judge's ruling on a motion to suppress evidence for an abuse of discretion. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). The military judge's findings of fact are reviewed for clear error, but his conclusions of law are reviewed de novo. *United States v. Keefauver*, 74 M.J. 230, 233 (C.A.A.F. 2015) (citation omitted).

"[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than just a difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citation omitted).

"A military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law." *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004). "In reviewing a ruling on a motion to suppress, we consider the evidence

in the light most favorable to the prevailing party." *United States v. Cowgill*, 68 M.J. 388, 390 (C.A.A.F. 2010) (citation omitted).

Servicemembers are generally entitled to the protections of the Fifth Amendment. *United States v. Tempia*, 37 C.M.R. 249, 253–55 (C.M.A. 1967). The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. Once a suspect in custody has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *see* Mil. R. Evid. 305(e)(3).

"The protections afforded to servicemembers under Article 31(b), UCMJ, 10 U.S.C. § 831(b), are in many respects broader than the rights afforded . . . under the Fifth Amendment to the Constitution." *United States v. Evans*, 75 M.J. 302, 303 (C.A.A.F. 2016) (citations omitted). Article 31(b), UCMJ, provides:

> No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

"Voluntariness of a confession is a question of law that an appellate court independently reviews, *de novo*." *United States v. Bubonics*, 45 M.J. 93, 94 (C.A.A.F. 1996) (citations omitted). A statement is "involuntary" if it is "obtained in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment to the United States Constitution, Article 31,[ UCMJ,] or through the use of coercion, unlawful influence, or unlawful inducement." Mil. R. Evid. 304(a)(1)(A); *see also* Article 31(d), UCMJ, 10 U.S.C. § 831(d) ("No statement obtained from any person in violation of [Article 31, UCMJ], or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial.").

In determining whether a confession has been elicited by means that are unconstitutional, it is necessary to look at the totality of the circumstances concerning whether "the confession [was] the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). "If [the confession] is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Id.* at 225–26. Factors to take into consideration in as-

sessing the totality of the circumstances include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep. *Id.* at 226.

An Article 31(b), UCMJ, and/or Fifth Amendment *Miranda* rights advisement need only generally orient an accused to the general nature of the crimes of which he is suspected and advise him of his right to remain silent and/or to have counsel present during any custodial interrogation. *See United States v. Campbell*, 76 M.J. 644, 653 (A.F. Ct. Crim. App. 2017). An investigator's use of trickery, artifice, or subterfuge in obtaining a confession is generally permissible, as long as the tactic does not result in coercion or an otherwise involuntary statement within the meaning of the Due Process Clause of the Fifth Amendment. *Id.* at 654 (citations omitted). "However, an investigator's use of such tactics in securing a rights waiver or in discouraging an invocation of rights invalidates the waiver and is clearly improper." *Id.* (citations omitted). As we emphasized in *Campbell*, "[w]hile the law may allow investigators to use deceit during other portions of an interview, the rendering of rights advice must be clear, honest, and understandable." *Id.* at 655.

Once an accused invokes his rights to counsel, law enforcement may not conduct an "interrogation" about the offenses until counsel is made available or the accused initiates further communication. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *see* Mil. R. Evid. 305. However, this request must be unequivocal. *United States v. Traum*, 60 M.J. 226, 230 (C.A.A.F. 2004) (citing *United States v. Sager*, 36 M.J. 137, 145 (C.M.A. 1992)).

Whether the accused actually invoked his right to counsel is an objective test. *Davis v. United States*, 512 U.S. 452, 459 (1994). "If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in the light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require a cessation of questioning." *Id.*

With limited exceptions, an involuntary statement of an accused and any evidence derived therefrom is inadmissible at trial, provided the defense makes a timely motion or objection. Mil. R. Evid. 304(a).

### 3. Analysis

On appeal, Appellant maintains his argument at trial that his statement was coerced by SA NC's reordering of the questions from the rights advisement card, and that he unequivocally asserted his right to counsel. We disagree.

After reviewing the military judge's ruling in the light most favorable to the prevailing party, we conclude the military judge did not abuse his discretion by denying the defense motion to suppress Appellant's statements. Here, the military judge's findings of fact are not disputed, nor is there any dispute that that the military judge applied the correct law. Reviewing de novo, we agree with the military judge's determination that Appellant's statements were voluntary. The military judge's conclusion that Appellant "was fully aware of his rights, understood the nature of his rights and generally how they would be applied," and that he "knowingly, intelligently, and voluntarily waived his rights" is adequately supported by the record. The military judge likewise did not abuse his discretion in concluding that Appellant made only an equivocal invocation of counsel prior to making an unequivocal waiver of this right to counsel. His findings of fact and conclusions of law that that Appellant's initial "yes?" regarding right to counsel was not "sufficiently clear" and "a reasonable police officer under the circumstances would NOT have understood the [Appellant's] response to have been articulated 'sufficiently clearly' enough to be a request for an attorney" are all supported by the record. Also, we find no error in the military judge's conclusion that the "reorganization of the questions on the rights advisement card was not designed to trick or confuse [Appellant]." *See Campbell*, 76 M.J. at 655. Based on our review of the entire exchange, we find that the military judge's ruling was accurately informed and supported by the record and applied the correct law, and that his application of the law to the facts was not "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Solomon*, 72 M.J. at 179. Therefore, Appellant is not entitled to any relief on this issue.

## D. Post-Trial Processing Delays

Appellant contends that he is entitled to sentence relief because he was subjected to unreasonable post-trial delay under *United States v. Moreno,* 63 M.J. 129 (C.A.A.F. 2006), and *United States v. Livak*, 80 M.J. 631 (A.F. Ct. Crim. App. 2020). We disagree, and find no relief is warranted.

### 1. Additional Background

Appellant was sentenced on 8 August 2021. At that time, Appellant's sentence did not meet the jurisdictional requirements for direct appeal to this court. As a result, an attorney designated under regulations prescribed by the Secretary of the Air Force completed an Article 65, UCMJ, 10 U.S.C. § 865, review of his trial. The Article 65, UCMJ, review was completed on 3 June 2022.

On 23 December 2022, Congress amended Articles 66 and 69, UCMJ, 10 U.S.C. §§ 866, 869.[9] As amended, Article 66(b)(1)(A), UCMJ, expanded the service Courts of Criminal Appeals' jurisdiction to any judgment of a special or general court-martial, irrespective of sentence, that included a finding of guilty. 10 U.S.C. § 866(b)(1)(A) (*Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*)). On 8 March 2023, Appellant filed with this court a notice of direct appeal *pro se* pursuant to Article 66(b)(1)(A), UCMJ, and this court docketed his case on 10 March 2023. On 21 April 2023, Appellant, through detailed military appellate defense counsel, filed a motion to compel a verbatim transcript. In response, the Government filed opposition to Appellant's motion to compel a verbatim transcript and simultaneously moved this court to dismiss Appellant's case for lack of jurisdiction, arguing that the amendments to Article 66, UCMJ, expanding jurisdiction did not apply to Appellant's case. On 7 September 2023, this court granted Appellant's request for a verbatim transcript and denied the Government's motion to dismiss Appellant's case. On 16 September 2023, the court reporter began transcription of the verbatim transcript. The sealed portions of the verbatim transcript were delivered to this court on 3 January 2024; the unsealed portions of the verbatim transcript were subsequently delivered on 11 January 2024.

After the certified verbatim transcript was delivered to this court, Appellant moved for five enlargements of time, four of which were opposed by the Government. As we noted, *supra,* on 5 June 2024, Appellant asked this court to remand his case because of omissions in the record of trial. On 24 June 2024, we remanded Appellant's case. On 12 July 2024, Appellant's case was re-docketed with the court. Appellant submitted his assignments of error on 29 July 2024. On 28 August 2024 the Government submitted its answer to Appellant's assignments of error. On 4 September 2024, Appellant filed his reply brief. On 31 October 2024, this court specified an issue for supplemental briefing in light of our superior court's decision in *Mendoza*, 2024 CAAF LEXIS 590, at \*12. On 16 December 2024, both parties submitted their specified issue briefs. Prior to the filing of briefs with this court Appellant did not request speedy appellate review.

### 2. Law

We review the question of whether an appellant's due process rights are violated because of post-trial delay de novo. *Livak*, 80 M.J. at 632. In *Moreno,* the United States Court of Appeals for the Armed Forces (CAAF) identified thresholds for facially unreasonable delay during three particular segments of

---

[9] National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, § 544, 136 Stat. 2395, 2582–84 (23 Dec. 2022).

the post-trial and appellate process. 63 M.J. at 141–43. Specifically, our superior court established a presumption of facially unreasonable delay where: (1) the convening authority did not take action within 120 days of the completion of trial, (2) the record was not docketed with the Court of Criminal Appeals (CCA) within 30 days of the convening authority's action, or (3) the CCA did not render a decision within 18 months of docketing. *Id.* at 142.

In *Livak,* this court recognized that "the specific requirement in *Moreno* which called for docketing to occur within 30 days of action no longer helps us determine an unreasonable delay under the new procedural rules." 80 M.J. at 633. In acknowledgment of this fact, this court established an aggregated sentence-to-docketing 150-day threshold for facially unreasonable delay in cases that were referred to trial on or after 1 January 2019.

Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." 63 M.J. at 135 (citations omitted). The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted).

Additionally, where an appellant has not shown prejudice from the delay, we cannot find a due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

"In the absence of a due process violation, this court considers whether relief for excessive post-trial delay is warranted consistent with this court's authority under Article 66(d), UCMJ, 10 U.S.C. § 866(d)." *Livak*, 80 M.J. at 632; *see also United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002); *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016).

### 3. Analysis

Appellant argues that he was subjected to unreasonable post-trial delay. Specifically, Appellant contends that his case was not docketed within 150 days of his sentencing as required by *Livak*, and also that a decision of this court was not rendered within 18 months of the docketing of his case as required by *Moreno*. Appellant requests sentence relief as a result of these delays.

We begin our analysis by stating that the 150-day threshold established in *Livak* does not apply to appeals by an accused under Article 66(b)(1)(A), UCMJ,

filed after Congress amended Articles 66 and 69, UCMJ, effective 23 December 2023. These statutory changes substantially altered the sequence of post-trial events in such cases. Unlike the old procedures for post-trial processing where the Government controlled the process, under the new procedures applicable to appeals under Article 66(b)(1), UCMJ (2024 *MCM*), an appellant is now in the driver's seat in determining whether post-conviction review is concluded under Article 65, UCMJ, or whether to seek appellate review from this court pursuant to Articles 66 and 69, UCMJ, and exercises significant control over the timing of that determination. In light of these variables, we decline at this time to establish a new specific timeframe for a facially unreasonable delay to cover the period of time from sentencing to docketing in direct-appeal cases. In this case, Appellant's case was docketed within two days of receiving Appellant's notice of direct appeal to this court pursuant to his right under Article 66(b)(1)(A), UCMJ. Based on the foregoing, we do not find a facially unreasonable delay in this case under the 150-day *Livak* standard, nor do we otherwise find a facially unreasonable delay, and accordingly no relief is warranted for excessive delay in docketing.

Appellant's second contention is that he is entitled to relief because a decision on his appeal was not rendered by this court within 18 months of his case being docketed. We determine that while the post-trial procedures of Appellant's appeal are different than the appeal procedures in place at the time *Moreno* and its progeny were decided, the right to speedy appellate review continues under these new procedures. We also determine that the 18-month *Moreno* standard for facially unreasonable delay from docketing to appellate decision still applies to determine if an appellant's due process right to speedy appellate review have been violated. In this case, Appellant's appeal was docketed with this court on 10 March 2023 without a verbatim transcript. We assume for purposes of this appeal that this court's remand of the record for correction and subsequent re-docketing of a corrected record did not reset the docketing date for *Moreno* purposes. We further assume that because a decision by this court on Appellant's appeal was not rendered within 18 months of 10 March 2023, Appellant has established a facially unreasonable post-trial delay.

Finding a facially unreasonable post-trial delay, we now assess whether a due process violation occurred. After considering the four *Barker* factors we conclude that no due process violation occurred because we do not find Appellant suffered any prejudice. We also do not find the delay in this case so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362. Finally, recognizing our authority under Article 66(d), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process

violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *Gay*, 74 M.J. at 744, we conclude it is not.

**E. Sentence Appropriateness**

As part of our charge under Article 66(d), UCMJ, authority, we consider sua sponte whether Appellant's sentence—30 days confinement, forfeiture of $2,645.00 pay per month for six months, and a reprimand—was inappropriately severe. Specifically, we consider whether two references in the reprimand concerning KK being asleep violated Appellant's rights by erroneously suggesting that he was convicted under a theory of liability that was not charged. As a matter of sentence appropriateness, we find it did and provide sentence relief.

### 1. Additional Background

A panel of officer members sentenced Appellant. Part of the adjudged sentence included a reprimand. Following trial, the convening authority provided the specific language for the reprimand, and the military judge entered it as follows:

> 1st Lt Douglas C. Boren is reprimanded as follows: You are hereby reprimanded! As an Air Force officer, you are held to a higher standard and charged with being a model for all Airmen to emulate. You have woefully failed to live up to these standards. You have dishonored yourself, and discredited the United States Air Force, when you committed abusive sexual contact against another officer, by touching her vagina through her clothing *while she was asleep*. There is no place in the United States Air Force for your egregious conduct. Your decision to violate a fellow officer, someone who trusted you and considered you a friend, *while she laid asleep* and vulnerable, showed that you value satisfying your own sexual desires above respecting the dignity of another. Your betrayal has had a lasting impact on her life and will forever stain her impression of fellow officers. I sincerely hope the punishment you have received causes you to appreciate the gravity of your actions and deters you from ever committing such reprehensible conduct in the future.

(Emphasis added).

### 2. Law

As a matter of sentence appropriateness, we review the wording of Appellant's adjudged reprimand *de novo* to determine whether it was inappropriately severe. *United States v. McAlhaney*, 83 M.J. 164, 167 (C.A.A.F. 2023) (citing *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006)).

We "may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as [we find] correct in law and fact and determine [ ], on the basis of the entire record, should be approved." Article 66(d)(1), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (citations omitted). Although we have broad discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

A reprimand is a punitive censure. R.C.M. 1003(b)(1), Discussion.

> In practice, [a reprimand] is a frank and common-sense expression of formal disapproval by the convening authority to the accused regarding the offenses for which the individual was sentenced. The reprimand may be based on the offenses, the evidence and testimony admitted at trial, and other matters that are properly before the convening authority such as a clemency request or a victim impact statement. Our military justice system grants the convening authority the discretion to choose the words of the reprimand. With few exceptions, in the Air Force, convening authorities are senior officers with a responsibility to preserve good order and discipline for the Airmen in their command.

*United States v. Wolcott*, No. ACM 39639, 2020 CCA LEXIS 234, at *16 (A.F. Ct. Crim. App 15 Jul. 2020) (unpub. op.).

**3. Analysis**

Appellant was convicted of abusive sexual contact by touching KK's vulva with his hand, through the clothing, with the intent to gratify his sexual desire without her consent. In light of our superior court's finding in *Mendoza,* we find that the two references in the reprimand to Appellant touching KK while she was asleep confuse the theory of liability on which Appellant was convicted.

Having considered the nature and seriousness of Appellant's misconduct, and matters contained in the entire court-martial record, including his record of service, all matters submitted in mitigation, and his written unsworn statement, we conclude the sentence as to the reprimand is inappropriate and that Appellant is entitled to sentence relief. We provide such relief in our decretal paragraph. We set aside the reprimand.

## III. CONCLUSION

We affirm only so much of the sentence as provides for 30 days' confinement and forfeiture of $2,645.00 pay per month for six months. The findings, as entered, and the sentence, as modified, are correct in law and fact, and no other error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence, as modified, are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court